IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRENDA WEST, ) | |
|     Plaintiff, ) | |
| ) | Case No. 10 C 5652 |
| v. ) | |
| ) | Magistrate Judge Geraldine Soat Brown |
| VILLAGE GREEN MANAGEMENT ) | |
| COMPANY, a Michigan Corporation, ) | |
|     Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Brenda West rented an apartment from defendant Village Green Management Company ("Village Green"). West alleges that on July 19, 2010, her kitchen pantry door fell on her due to Village Green's negligence, and she suffered severe leg injuries and was immobilized her in her apartment for three days. (Third Am. Compl.) [Dkt 35.] The court has jurisdiction under 28 U.S.C. § 1332, and the parties have consented to the jurisdiction of the magistrate judge under 28 U.S.C. § 636 [dkt 16]. A jury trial is scheduled to begin on April 15, 2013. Before the court are Village Green's motions *in limine* nos. 1-8 and West's motions *in limine* nos. 1-21. The motions are ruled on as set forth below.

**Legal Standard**

Generally, "[m]otions *in limine* are disfavored." *Mi-Jack Prods. v. Intl. Union of Operating Engrs., Loc. 150*, No. 94 C 6676, 1995 WL 680214 at *1 (N.D. Ill. Nov. 14, 1995). A motion *in limine* should only be granted when "the evidence is clearly inadmissable for any purpose." *Obrycka*

1

*v. City of Chicago*, No. 07 C 2372, 2012 WL 4060293 at *1 (N.D. Ill. Sept. 14, 2012). The movant bears the burden of showing that the evidence that it seeks to preclude is "clearly inadmissible." *Plair v. E.J. Brach & Sons, Inc.*, 864 F. Supp. 67, 69 (N.D. Ill. 1994). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partns. v. AT&T Techs., Inc.* 831 F. Supp. 1398, 1400-01 (N.D. Ill. 1993.) Denial of a motion *in limine* is *not* a ruling that the material subject to the motion is necessarily admissible. Rather, it "means only that outside the context of trial, the court cannot determine whether the evidence in question is admissible." *Plair,* 864 F. Supp at 69.

The court's standing order for motions *in limine* requires that parties meet and confer before filing any motions so that the time of the parties and the court is not wasted by uncontested motions. (*See* Standing Order Regarding Trial Preparation For Civil Consent Cases Before Magistrate Judge Brown, http://www.ilnd.uscourts.gov/home/JUDGES/BROWN/trialprep2007.pdf) (last viewed Mar. 13, 2013).) The court explained this aspect of the standing order to counsel at a status hearing on January 15, 2013. [*See* dkt 62.] In this case, Village Green has filed eight motions, only three of which are contested by West. West has filed 21 motions, including one filing that contained nine separate motions. Village Green does not contest 13 of West's motions. According to Village Green, parties were not able to meet and confer because West's counsel was at trial in another case. (*See, e.g.,* Def's MIL No. 1 ¶5) [Dkt 64.] The motions that are contested are skeletal and contain little, if any, citation to authority, contrary to the Standing Order Regarding Trial Preparation which requires each motion to cite authority supporting the requested relief. Much time and paper could have been saved had the parties complied with the court's standing order. West's uncontested

motions *in limine* nos. 1-11, 17, 18 [dkt 77, 78, 84, 85, 89] and Village Green's uncontested motions *in limine* nos. 2, 4, 6-8 [dkt 65, 67, 69-71] are denied as moot.

The remaining motions can be split into two categories: expert motions implicating *Daubert v. Merell Dow Pharms.*, 509 U.S. 579 (1993), and non-expert motions.

**I.**     ***Daubert* motions**

Federal Rule of Evidence 702, which governs the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the Supreme Court emphasized the "gatekeeping" role of the federal trial judge in ensuring that expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589 n.7, 597. To make this determination, courts consider: (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline; and (3) whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *See Myers v. Ill. C. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)). "The proponent of the expert bears the burden of demonstrating that the expert's

3

testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702 advisory comm. nn. (2000 Amends.)).

    A.    <u>Village Green's Amended Motion *in Limine* No. 1[1]</u>

Village Green seeks to exclude West's retained architect Gregory P. Wisniewski from opining as to the amount of force that the falling door would have had when it struck West. (Def.'s Am. MIL No. 1.) [Dkt 76.] Village Green argues that as an architect, Mr. Wisniewski is not qualified to testify as to the amount of force because that is the domain of an engineer and not an architect. (*Id.* ¶ 6.)

The line between architect and engineer is not as stark as Village Green would have it. First, Mr. Wisniewski's resume describes his architecture degree as a five year professional degree – "Engineering Option with an Emphasis in Structural Engineering." (Def.'s Am. MIL No. 1, Ex. A.) Next, Illinois law defines the practice of architecture to include "structural design," and to be a licensed architect, one has to take an examination which tests, in part, "lateral forces" and "general structures." 225 Ill. Comp. Stat. § 305/5(b); *id.* § 305/12. Under Illinois law, licensed architects are exempt from the requirements governing the practice of structural engineering, that is, "architects can practice structural engineering, when properly qualified to do so." Ill. Dep't of Fin. and Prof. Reg., *Manual for Code Enforcement Officials and Design Professionals* 7 (August 2012) (available at http://www.idfpr.com/?DPR/WHO/AR/Design_Code_Manual.pdf (last viewed Mar. 13, 2013)); 225 Ill. Comp. Stat. § 305/7. Structures that fall within the practice of structural engineering include those "in which safe design and construction require that loads and stresses must be computed and

---

[1] Village Green's original motion was struck as insufficient as it failed to cite any relevant authority or contain any substantive argument. [Dkt 75.]

the size and strength of parts determined by mathematical calculations based upon scientific principles and engineering data." 225 Ill. Comp. Stat. § 340/5. Lastly, West states that Mr. Wisniewski "can testify . . . that architects typically will design building including structural loads without the use of any engineer." (Pl.'s Resp Def.'s MIL No. 1 ¶ 4.) [Dkt 92.] Thus, as an architect, Mr. Wisniewski has a sufficient background in engineering and the calculation of forces such that he is qualified to opine as to as to the amount of force with which the door fell. Accordingly, Village Green's motion is denied.

  B. <u>West's Motion *in Limine* No. 19</u>

In a motion that contains no citation to any legal authority, West moves to bar the opinion testimony of Village Green's retained expert Dr. Daniel Derman. (Pl.'s MIL No. 19.) [Dkt 86.] There is no formal written report authored by Dr. Derman as required by Fed. R. Civ. P. 26(a)(2)(B); the parties advise the court that they stipulated between themselves that such a report was not necessary. (*Id*., Ex. A at 2.) Instead, there is a summary of Dr. Derman's anticipated testimony. (Pl.'s MIL No. 19, Ex. A at 2.) West characterizes as speculation Dr. Derman's opinions that West had a history of falls that may be related to disabilities or drug use, and that West's falls following the July 2010 incident cannot be distinguished from the falls prior to the July 2010 incident.[2] (Pl.'s MIL No. 19 ¶ 4.) West also objects to Dr. Derman's conclusion, arrived at by differential diagnosis, that misuse of narcotics/medication is a "leading probable cause" for West's alleged inability to

---

[2]West also objects to this opinion on the grounds that it "invade[s] the jury's province of ultimate fact questions of her injuries." (Pl.'s MIL No. 19 ¶ 4.) Fed. R. Evid. 704(a) provides, however, that "[a]n opinion is not objectionable just because it embraces an ultimate issue."

5

move around her apartment for days after the door fell on her. (*Id*. ¶ 5.)

Dr. Derman's deposition testimony shows that his opinions are not speculative but instead based on a review of West's medical records that document her history of falls and prescription drug use issues. (*See* Def.'s Resp. MIL No. 19, Ex. A, Dep. Dr. Daniel Derman at 26-31, 39-43.) [Dkt 101.] Further, there is nothing controversial about the methodology of differential diagnosis. *See Myers*, 629 F.3d at 644. Accordingly, West's motion *in limine* no. 19 is denied.

### C. West's Motion *in Limine* No. 20

West also moves to bar the opinion testimony of Village Green's retained expert Dr. Steven Usher Brint. (Pl.'s MIL No. 20.) [Dkt 87.] As with Dr. Derman, the parties apparently stipulated that a formal expert report was not required for Dr. Brint. (Pl.'s MIL No. 20, Ex. A at 4.) West contends that Dr. Brint's opinion that the "most probable medical cause for West's inability to move around" was "misuse of narcotic/medications as a leading contributing cause" is speculation. (*Id*. ¶ 3.) That argument fails for the same reasons that it failed with regards to Dr. Derman. Dr. Brint based his opinion on West's medical records, not mere speculation, and he may use differential diagnosis to reach a conclusion (*See* Def.'s Resp. Pl.'s MIL No. 20, Ex. A, Dep. Dr. Steven Usher Brint at 26-28.) [Dkt 102.][3]

West also objects to Dr. Brint's anticipated opinion that:

> Plaintiff's statement in her deposition that she lied to doctors about the experience of pain in her body before the July 2010 incident, in order to obtain excessive prescription drugs, must be considered in evaluating her post July 2010 complaints.

---

[3] West also cites two Illinois cases that concern what a plaintiff must show in order to establish proximate cause. (Pl.'s MIL No. 20 ¶ 4.) Because Village Green is not the plaintiff and therefore does not bear the burden of proof, those cases have no bearing on Dr. Brint's anticipated testimony.

> Her statement calls into question any subjective complaint, including any description of severity of pain or disability, including any description of severity of pain or disability, and in this respect, only objective data can be relied upon.

(Pl.'s MIL No. 20 ¶ 2 and Ex. A at 5.) West complains that this opinion is impermissible because "Dr. Brint cannot testify as to the credibility of any witness." (*Id*. ¶ 2.) Dr. Brint's deposition testimony also contains indications that Dr. Brint doubts West's credibility. (*See, e.g.,* Dr. Brint Dep. at 27.) West is correct that an expert "cannot testify as to credibility issues" as those are for the trier of fact. *Goodwin v. MTD Prods. Inc.*, 232 F.3d 600, 609 (7th Cir. 2000).

That being said, it is not clear that Dr. Brint is will, in fact, opine as to the credibility of West's testimony. If Dr. Brint is stating that, in determining the extent of West's injuries, he is discounting West's current complaints of pain because of her alleged history of lying to doctors, that opinion might be admissible depending on the context in which it is offered. Given that there is no proper Rule 26(a)(2)(B) disclosure that lays out Dr. Brint's opinions in full, the court cannot conclude at this point that any of Dr. Brint's opinions are clearly inadmissible. Accordingly, West's motion *in limine* no. 20 is denied without prejudice to any objection that West may make to any testimony by Dr. Brint about West's credibility.

### D. West's Motion *in Limine* No. 21

West seeks to bar the opinions of Village Green's retained expert engineer Ms. Suzanne Alton-Glowiak. (Pl.'s MIL No. 21.) [Dkt 88.] West takes issue with Ms. Alton-Glowiak's opinions that West was a "habitual drug use and had frequent falls" and that "[t]he force [inflicted upon West] was likely precipitated by Ms. West pulling the door toward her, most probably for support." (Def.'s Resp. Pl.'s MIL No. 21, Ex. B, Rep. Susan Alton-Glowiak at 8.) Village Green agrees that Ms.

Alton-Glowiak will not testify as to West's alleged drug use or that West pulled the door down for support. (Def.'s Resp. Pl.'s MIL No. 21 ¶ 1.) [Dkt 96.]

West also seeks to bar as "mere speculation" Ms. Alton-Glowiak's opinion that "[t]he cause of Ms. Brenda West's incident was a failure to properly use the door." (Pl.'s MIL No. 21 ¶ 2; Alton-Glowiak Rep. at 11.) Village Green objects to the exclusion of this opinion to the extent that it seeks to bar Ms. Alton-Glowiak's testimony "about the torque and/or force necessary to pull the door down, and whether or not Plaintiff possessed the strength and ability to pull the door off its hinge." (Def.'s Resp. Pl's MIL 21 ¶ 7.) Contrary to West's assertion, Ms. Alton-Glowiak's report demonstrates that her opinion about West's failure to properly use the door is not based on "mere speculation," but instead on Ms. Alton-Glowiak's inspection of the door and her analysis of the force that would have been caused by the falling door. (*See* Pl.'s MIL No. 21 ¶ 3; Alton-Glowiak Rep. at 8-10.) Ms. Alton-Glowiak summarizes her opinion as follows:

> The most likely scenario is that Ms. West pulled the door while it was open and twisted it toward herself-causing torsion in the pin at the top. Enough force was imparted to split the door seam, elongate the hole and pull the pivot assembly from its compression fitting. By forcibly pulling the door onto herself, Ms. West could have created enough force to cause injury.

(*Id.* at 10.) Ms. Alton-Glowiak's opinion about the cause of the falling door is based on facts and data that are within her realm of expertise, and thus her opinion about West's failure to properly use the door is admissible. Accordingly, West's motion *in limine* no. 21 is denied as moot with respect Ms. Alton-Glowiak's opinions about West's drug use or West's using the door for support. The motion is denied with respect Ms. Alton-Glowiak's opinion regarding West's "failure to properly use the door." (*See id.* at 11.)

8

## II. Other Motions

### A. Village Green's Motion *in Limine* No. 3

Village Green's motion *in limine* no. 3 seeks to exclude Dr. Myra Vicenio from testifying that West suffered "pain from nerve injury," which is the stated subject of her testimony in West's Fed. R. Civ. P. 26(a)(2)(C) summary disclosures. (Def.'s MIL No. 3 ¶ 2 and Ex. B, Pl.'s Third Am. Rule 26(a)(2) Disclosures at 4.) [Dkt 66.] According to Village Green, West's disclosure is inconsistent with Dr. Vicenio's deposition wherein she testified that West had pain from rhabdomyolysis caused by muscle injury.[4] (*Id.*, Ex. C, Dep. Dr. Myra Vicenio at 28, 40.)

There appears to be a disconnect between the motion and West's response. West agrees that Dr. Vicenio diagnosed West with rhabdomyolysis, which is muscle damage that can be caused by trauma, strenuous exercise or medications. (Pl.'s Resp. Def.'s MIL No. 3 ¶ 2.) [Dkt 93.] West says, "The cause of her pain is unequivocally the result of rhabdomyolysis from muscle injury." (*Id.* ¶ 4.) West acknowledges that her disclosure refers to "nerve injury," but does not explain the discrepancy. (*Id.*) Instead, West opposes the motion on the grounds that Village Green "attempts to foreclose any opinions . . . that Plaintiff sustained trauma from the fall of the door on her resulting in rhabdomyolysis with extensive muscle injury to the left lower leg resulting in a great deal of pain and weakness." (*Id.* ¶ 7.) The court does not read Village Green's motion as attempting to limit such testimony. Because neither Dr. Vicenio's deposition nor West's response to the motion give any indication that Dr. Vicenio intends to testify that West suffered pain due to a nerve injury as opposed to a muscle injury, Village Green's motion is granted as follows: Dr. Vicenio may testify

---

[4]Rhabdomyolysis is the "disintegration or dissolution of muscle, associated with excretion of myoglobin in the urine." *Dorland's Illustrated Medical Dictionary* 1637 (32nd ed., Elsevier Saunders 2012) [hereinafter *Dorland's*].

consistently with her deposition that she diagnosed West with rhabdomyolysis from muscle damage but she may not testify that West suffered nerve injury.

### B. Village Green's Motion *in Limine* No. 5

Village Green seeks to exclude Dr. Christine Valessares from testifying as to the cause of West's post-traumatic stress disorder ("PTSD"), depression, and panic disorder because Dr. Valessares did not diagnose West with any of these conditions. (Def.'s MIL No. 5) [Dkt 68.] West's disclosure under Fed. R. Civ. P. 26(a)(2)(C) regarding Dr. Valessares described her as testifying to "causation of post traumatic stress disorder, depression, aggravation of panic order, flashbacks and acute reaction to stress." (Def.'s MIL No. 5, Ex. B at 5.) West does not contest the motion with respect to depression or anxiety. (Pl.'s Resp. MIL No. 5 ¶ 1.) [Dkt 94.] Accordingly, Dr. Valesarres will not be permitted to testify about those subjects.

West, however, does take issue with Village Green's motion seeking to exclude Dr. Valesarres's testimony regarding PTSD. According to West, "Dr. Valessares specifically stated that acute stress disorder if continuing for longer than thirty days is then termed post traumatic stress disorder." (*Id.* ¶ 2.) That is not precisely correct. Dr. Valessares diagnosed West with acute stress reaction; she did not diagnose West as having PTSD. (Def.'s MIL No. 5, Ex. A, Dep. Dr. Christine Valessares at 8.) In her deposition, Dr. Valesarres testified that "many times about 80% of the [acute stress reaction] cases would progress into post-traumatic stress disorder," but she did not have contact with West for a long enough period to diagnose her with PTSD because it "is usually not diagnosed until 30 days after the onset of the trauma." (*Id.* at 9.) Dr. Valessares last treated West on August 17, 2010, approximately 30 days after the incident. (Valessares Dep. at 9.) When asked

10

if it would be fair to say that she did not have any opinion as to the cause of West's PTSD, Dr. Valessares testified:

> [T]he cause for acute reaction to stress would factor into a diagnosis of PTSD later. Usually it's the same traumatic event that would give a diagnosis of acute reaction to stress. It would be the same event that would later then lead to a diagnosis of post-traumatic stress disorder.

(*Id.* at 10.) Thus, Dr. Valessares, having never diagnosed West as having PTSD cannot, strictly speaking, testify as to the causation of that condition that she admits she did not observe. However, she may testify consistently with her deposition.

Accordingly, Village Green's motion *in limine* is denied as moot with respect to causation of West's depression and anxiety because West has stated that Dr. Valessares will not testify about those. It is granted in part as set out here.

### C. West's Motion *in Limine* No. 12

West moves to bar questions of West's treating orthopedic surgeon Dr. David Attarian or any other treater that West's pre-existing spinal stenosis was a cause of West's flailed foot or foot drop.[5] (Pl.'s MIL No. 12.) [Dkt 79.] In Dr. Attarian's deposition, Village Green's counsel asked whether spinal stenosis "could lead to foot drop." (*Id.*, Ex. A, Dep. Dr. Attarian at 25.) Dr. Attarian responded that "spinal stenosis causes foot drop in some patients." (*Id.* at 26.)[6]

---

[5] Foot drop is the "dropping of the foot from a peroneal or tibial nerve lesion that causes paralysis of the anterior muscles of the leg." *Dorland's* at 728.

[6] At various points throughout her motions, West states that certain deposition transcripts of her treating professionals have been forwarded to the court. (*See, e.g.*, Pl.'s MIL No. 12 ¶ 5; Pl.'s MIL No. 14 ¶ 2 [dkt 81]; Pl.'s MIL No. 17 ¶ 1 [dkt 84].) The court has not received the deposition transcripts referenced in the motions and has only the excerpts that were attached to the motions. If a party intends to use any deposition testimony at trial, the transcripts must be marked as required by the court's Standing Order for Trial Preparation and delivered to the court by March 22, 2013.

West argues that because none of West's treating physicians nor Village Green's experts have opined that West's foot drop was caused by her spinal stenosis, any question suggesting that West's spinal stenosis caused her foot drop is irrelevant and prejudicial. (Pl.'s MIL ¶¶ 6-7.) Village Green does not argue that there is any evidence showing that West's foot drop was caused by her spinal stenosis, but contends that it may show that spinal stenosis . . . is one possible cause of a drop foot." (Def.'s Resp. Pl.'s MIL No. 12 ¶ 2.) [Dkt 97.] Per Village Green, "[t]his testimony will assist the trier of fact in its calculation of damages in this matter, that is, that based upon Plaintiff's pre-existing condition (spinal stenosis), she was already at some increased risk of suffering a drop foot condition." (*Id.*) Village Green goes on to state that the "possible causes of Plaintiff's condition are relevant to the determination of Defendant's liability." (*Id.* ¶ 3.)

Absent any indication that West's spinal stenosis caused her foot drop, evidence that spinal stenosis can lead foot drop is irrelevant to this case and will only serve to confuse the jury. *See Lagestee v. Days Inn Mgt. Co.,* 709 N.E.2d 270, 279-280 (Ill. App. 1st Dist. 1999) (finding that studies showing that smoking causes premature disk deterioration were not sufficient to demonstrate relevance absent evidence establishing a link between plaintiff's smoking and plaintiff's disk herniation); *Karsten v. McCray*, 509 N.E.2d 1376, 1380 (Ill. App. 2d Dist. 1987) ("[T]he party arguing the relevancy of a preexisiting condition must show more than a mere possibility that the preexisting condition is the cause of the injury.")

Further, Village Green's argument about West's increased probability of foot drop due to the spinal stenosis runs afoul the principle that "[a] tortfeasor is liable for the injuries he causes, even though the injuries may not have occurred but for the peculiar preexisting weaknesses of the injured

---

[Dkt 62.]

person." *Wojcik v. City of Chicago*, 702 N.E.2d 303, 312 (Ill. App. 1st Dist. 1998); *see also Perfect v. Kaley,* 264 N.E.2d 430, 433 (Ill. App. 1st Dist. 1970) (finding that "where the result of an accident was to activate an injury to which an injured person was predisposed, the defendant was liable for the entire damages which ensued.") Under that principle, that West was already at risk for foot drop does not mitigate Village Green's potential liability for causing her foot drop. Accordingly, absent evidence that her pre-existing spinal stenosis caused her foot drop, that West may have been at an increased risk of foot drop is irrelevant to liability or damages under Fed. R. Evid. 401. Alternatively, if that evidence has any relevance, it is outweighed by the likelihood that it would confuse the jury and lead the jury to speculate improperly whether West's foot drop condition was caused by spinal stenosis. Thus, that evidence is excluded under Fed. R. Evid. 403. West's motion *in limine* no. 12 is granted.

### D. West's Motion *in Limine* No. 13

West moves to bar Village Green from asking West's treating physicians whether they knew that West had a drug abuse problem prior to July 2010. (Pl.'s MIL No. 13.) [Dkt 80.] West argues that because none of West's treating physicians have testified that West abused drugs, it would be improper to ask them about her pre-July 2010 drug use. (*Id.* ¶ 4.) In response, Village Green argues that West's misuse of drugs is relevant because its expert Dr. Derman believes that West's medication rather than the impact from the door caused her incapacitated state. (Def.'s Resp. Pl.'s MIL No. 13) [Dkt 95.]

Village Green has evidence to suggest that West may have had problems with drugs prior to July 2010. Specifically, Village Green has produced medical records that show that West was

13

admitted for an oxycodone overdose in January 2010, and that on July 13, 2010, five days before the incident, she was admitted to a clinic because of her "dependence on strong narcotics." (Def.'s Resp. Pl.'s MIL No. 13, Ex. A, B.) Village Green has also produced deposition testimony from West, West's sister-in-law, and West's psychiatrist that indicates that West had problems with drugs prior to the July 2010 incident. (*Id.,* Ex. C-E.) West's history of drug use and whether her treating physicians were aware of that prior drug use is relevant to this case, and thus West's motion in *limine* no. 13 is denied.

### E. West's Motion *in Limine* No. 14

West moves to bar Village Green from questioning Dr. Valessares regarding the side effects of Ativan, a medication that Dr. Valessares prescribed for West. (Pl.'s MIL No. 14.) [Dkt 81.] In her deposition, Dr. Valessares testified that Ativan, the brand name for anti-anxiety drug lorazepam (*Dorland's* at 173, 1074), can cause confusion, drowsiness, or dizziness. (Pl.'s MIL No. 14, Ex. A.) West argues that Village Green has not established that West experienced any side effects from Ativan and thus should not be able to raise the issue at trial. Village Green argues that the testimony about side effects would not be presented to show a "causal link in this specific case, but to show that Ativan, which was undisputedly being used by Plaintiff at the time of the occurrence, is known to cause drowsiness and dizziness." (Def.'s Resp. Pl.'s MIL No. 14 ¶ 2.) [Dkt 100.] Village Green adds that the "possible causes of Plaintiff's condition are relevant to the determination of Defendant's liability." (*Id.* ¶ 3.)

The side effects of Ativan are potentially relevant to this case. For example, although not specifically mentioned in Village Green's response, Dr. Derman has opined that West's use of

Ativan contributed to her allegedly intoxicated state prior to the door falling on her. (Dr. Daniel Derman Dep. at 43-44.) Accordingly, as West has not established that the known side effects of Ativan are not admissible for any purpose, West's motion is denied.

### F. West's Motion *in Limine* No. 15

West moves to bar Village Green from arguing that West's osteoarthritis exacerbated or caused West's injuries. (Pl.'s MIL No. 15.) [Dkt 82.] Village Green responds that, while it does not intend to argue that West's osteoarthritis caused West's foot drop, West and Village Green agree that West's osteoarthritis is relevant to damages to show that West's pre-existing disabilities were likely to impair her gait and movement in the future, so that the jury can determine what disability was caused by the incident at issue. (Def.'s Resp. Pl.'s MIL No. 15.) [Dkt 98.] Village Green agrees that West's treating doctor Moore will not be asked to express an opinion that West's foot drop was caused by arthritis. (*Id*.) Accordingly, West's motion *in limine* no. 15 is denied as moot.

### G. West's Motion *in Limine* No. 16

Village Green subpoenaed West's prescription records form the Illinois Prescription Monitoring Program ("IPMP"). (Pl.'s MIL No. 16.) [Dkt 83.] West moves to bar these records from being introduced because Village Green has presented no witness to provide foundation for the documents. (*Id*. ¶ 2) Additionally, West argues that the documents are "inconsistent on their face" as "there are entries for prescription numbers that have been filled more than one time" which West claims – without any factual support – is "impossible." (*Id.* ¶ 3.)

West's objection that the records are inconsistent is not convincing; it seems possible that

when a prescription is refilled, the prescription number remains the same. For example, prescription number 516093 appears to have been filled four times over the course of a few months with a few weeks interval in between fillings. (*See e.g. id.*, Ex. A at 13, Prescription No. 516093).

As for West's objection to foundation, Village Green responds by pointing to the IPMP's authorizing statute which provides that an investigator or law enforcement officer that receives confidential prescription information "may disclose the information to a law enforcement officer or an attorney for the office of the Attorney General for use as evidence" in "a proceeding under any State or federal law that involves a controlled substance." (Def.'s Resp. Pl.'s MIL No. 16 ¶ 2 (quoting 720 Ill. Comp. Stat. § 570/318(h)).) [Dkt 99.] Village Green argues – without citing authority – that the provision means that the records are admissible in any proceeding under Illinois state law. (Def.'s Resp. Pl.'s MIL No. 16 ¶ 2.) Village Green's reading of the statute is incorrect. The statute governs to whom and for what purpose the information can be disclosed, and does not establish that the records are *per se* admissible. Further, to the extent that the statute may proscribe a state evidentiary rule, it is irrelevant to the issue of whether the documents are admissible in federal court, because admissibility in federal court is governed by the federal, not state, rules of evidence. *Park v. City of Chicago*, 297 F.3d 606, 611 (7th Cir. 2002) ("The Federal Rules of Evidence, not provisions of state law, govern the admissibility of evidence in federal court.").

The prescription records attached to West's motion are hearsay, although they may be admissible under one or more of the hearsay exceptions in Fed. R. Evid. 803 and 804. If Village Green intends to use the records, it must submit a complete copy of the records, including any certification in support, with its trial exhibits pursuant to the court's standing order for trial preparation. *See* Standing Order Regarding Trial Preparation For Civil Consent Cases Before

Magistrate Judge Brown. West may lodge its objections to the documents at that time in the manner described in the court's standing order. Accordingly, West's motion *in limine* no. 16 is denied without prejudice to a future objection made in the draft pretrial order.

**CONCLUSION**

For the foregoing reasons, West's motions *in limine* nos. 1-11, 17, 18 and Village Green's motions *in limine* nos. 2, 4, 6-8 are denied as moot. West's motions *in limine* nos. 13-16, 19-21 and Village Green's motions *in limine* no. 1 are denied as stated above. Village Green's motion *in limine* no. 3 and West's motion *in limine* no. 12 are granted as stated above. Village Green's motion *in limine* no. 5 is granted in part and denied in part as stated above. At trial, if any party believes evidence is being introduced in violation of these rulings, the party must object at that time.

_____
Geraldine Soat Brown
United States Magistrate Judge

**DATE:** March 15, 2013